LNE/mch 10.25.24



**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

| | | |
|---|---|---|
| Michael C. Hanlon<br>Assistant United States Attorney | Suite 400<br>36 S. Charles Street<br>Baltimore, MD 21201-3119 | DIRECT: 410-209-4895<br>MAIN: 410-209-4800<br>FAX: 410-962-9293<br>Michael.Hanlon@usdoj.gov |

October 25, 2024

✓ FILED ___ ENTERED
___ LOGGED ___ RECEIVED

C. Justin Brown, Esquire

12:32 pm, Feb 05 2025

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY ____TTD____ Deputy

Re:   United States v. Corey Riley
       Criminal No. 24-mj-01500-ABA/ ELH-24-0362

Dear Counsel:

This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, Corey Riley (hereinafter "Defendant"), by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by November 15, 2024, it will be deemed withdrawn. The terms of the Agreement are as follows:

### Offenses of Conviction

1.  The Defendant agrees to waive indictment and to plead guilty to Count One of a Criminal Information, which will charge him with Conspiracy to Distribute Narcotics (in violation of 21 U.S.C. § 846). The Defendant admits that the Defendant is, in fact, guilty of the offense and will so advise the Court.

### Elements of the Offense

2.  The elements of the offenses to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

   Count One - That in or about January through June 2024, in the District of Maryland and elsewhere,

   i. two or more persons entered the unlawful agreement charged in the Information to distribute 5 kilograms or more cocaine; and

   ii. the Defendant knowingly and willfully became a member of that conspiracy.

Rev. August 2018

1

Penalties

3. The maximum penalties provided by statute for the offense(s) to which the Defendant is pleading guilty are as follows:

| Count | Statute | Minimum Prison | Maximum Prison | Supervised Release | Maximum Fine | Special Assessment |
|---|---|---|---|---|---|---|
| 1 | 21 U.S.C. § 846 | 10 yrs | Life | At least 5 years, max. of life | $10,000,000 | $100 |

a. Prison: If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

b. Supervised Release: If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment as permitted by statute, followed by an additional term of supervised release.

c. Restitution: The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

d. Payment: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

e. Forfeiture: The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

f. Collection of Debts: If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt. If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law. Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control. Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns. The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

## Waiver of Rights

4. The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

    a. If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

    b. If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

    c. If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

    d. The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

    e. If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

    f. By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

g.  If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

h.  By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

## Advisory Sentencing Guidelines Apply

5.  The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. § 3551-3742 (excepting 18 U.S.C. § 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

## Factual and Advisory Guidelines Stipulation

6.  This Office and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein. This Office and the Defendant further agree that:

   a.  The guidelines level are as follows:

   **Base offense level: 34** based on the combined cocaine and fentanyl involved in the offense and/or intended to be distributed in furtherance of and reasonably foreseeable within the scope of the conspiracy (U.S.S.G. § 2D1.1(c)(3)

   **Increase by 2 levels** because a firearm was possessed (2D1.1(b)(1))

   b.  The Defendant reserves the right to seek a downward departure on the grounds of overrepresentation of criminal history pursuant to U.S.S.G. § 4A1.3. The government reserves the right to oppose such an adjustment.

4

c. This Office does not oppose a **2-level reduction** in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a), based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an **additional one-level decrease** in recognition of the Defendant's acceptance of personal responsibility for the Defendant's conduct. This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way. **Adjusted offense level: 33.**

7. There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

8. Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

## Obligations of the Parties

9. At the time of sentencing, this Office and the Defendant reserve the right to advocate for a reasonable sentence, period of supervised release, and/or fine considering any appropriate factors under 18 U.S.C. § 3553(a). This Office and the Defendant reserve the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that this Office or the Defendant deem relevant to sentencing, including the conduct that is the subject of any dismissed counts. At the time of sentencing, this Office will move to dismiss any open counts pending in the above-referenced case number.

## Waiver of Appeal

10. In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

      a.      The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute(s) to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute(s), to the extent that such challenges legally can be waived.

      b.      The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release).

      c.      The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

## Forfeiture

11.      The Defendant understands that the Court may enter an Order of Forfeiture as part of the Defendant's sentence, and that the Order of Forfeiture may include assets directly traceable to the offense(s), substitute assets, and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offenses.

12.      Specifically, but without limitation on the Government's right to forfeit all property subject to forfeiture as permitted by law, the Defendant agrees to forfeit to the United States all of the Defendant's right, title, and interest in any money, property, and/or assets derived from or obtained by the Defendant as a result of, or used to facilitate the commission of, the Defendant's illegal activities, including the following:

- approximately $302,205 in United States currency;
- approximately $11,000 in United States currency;
- approximately $4,066 in United States currency;
- a .357 caliber Glock semi-automatic handgun bearing serial number BWEY764;
- approximately 14 rounds of .357 caliber ammunition;
- an extended magazine loaded with .40 caliber ammunition; and

6

- One brown and silver single shot .22 caliber pistol bearing serial number 88638.

13. The Defendant agrees to consent to the entry of orders of forfeiture for the property described above and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2, and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding forfeiture during the change of plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

14. The Defendant agrees to assist fully in the forfeiture of the property described above. The Defendant agrees to disclose all assets and sources of income, to consent to all requests for access to information related to assets and income, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including executing all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are made available for forfeiture.

15. The Defendant waives all challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including any and all constitutional, legal, equitable, statutory, or administrative grounds brought by any means, including through direct appeal, habeas corpus petition, or civil complaint. The Defendant will not challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this Agreement, and will not assist any third party with any challenge or review or any petition for remission of forfeiture.

### Defendant's Conduct Prior to Sentencing and Breach

16. Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

17. If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) this Office will be free from its obligations under this Agreement; (ii) this Office may make sentencing arguments and recommendations different from those set out in this Agreement, even if the Agreement was reached pursuant to Rule 11(c)(1)(C); and (iii) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea—even if made pursuant to Rule 11(c)(1)(C)—if the Court finds that the Defendant breached the Agreement. In that event, neither

7

the Court nor the Government will be bound by the specific sentence or sentencing range agreed and stipulated to herein pursuant to Rule 11(c)(1)(C).

Court Not a Party

18. The Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties. The Court has the power to impose a sentence up to the maximum penalty allowed by law. If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement. Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

Entire Agreement

19. This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Erek Barron
United States Attorney

_/s/_____
Michael C. Hanlon
Assistant United States Attorney

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

11.18.2024
Date

Corey Omar Riley

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

11/18/24
Date

C. Justin Brown, Esquire

9

## ATTACHMENT A

### STIPULATION OF FACTS

*The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

During from at least approximately January 2024 until June 2024, the Defendant Corey Omar Riley agreed with other persons to engage in the distribution of cocaine in the District of Maryland and in other locations. Riley engaged in that conspiracy with another Maryland defendant, Co-Conspirator 1 (CC-1) and other persons. It was reasonably foreseeable to Riley and within the scope of and in furtherance of the conspiracy that at least 50 kilograms of cocaine would be distributed in furtherance of the conspiracy.

During the conspiracy, Riley and CC-1 used an apartment in Baltimore City, Maryland (hereinafter the Saratoga Apartment) as a location for storing narcotics and narcotics paraphernalia. The apartment was not rented in the name of Riley or CC-1 but was rented in the name of another person to conceal the Defendants' connection to the apartment. On May 9, 2024, investigators executed an authorized federal delayed notice search warrant at the Saratoga Apartment. During the search, investigators found the location to be sparsely furnished. During the search, drug processing equipment, such as chemical masks, a large industrial sized mixer with a white powder residue on it, a mechanical press, and a large amount of unfilled gelatin capsules were located. Also, a quantity of a substance believed to be narcotics or a narcotics cutting material was found in the location. Lastly, investigators discovered several suspected fake driver's licenses all with CC-1's photograph but each with a different name and date of birth.

Investigators were able to introduce a Drug Enforcement Administration (DEA) undercover officer (UC) to CC-1. UC presented as being an individual who could acquire kilogram quantities of cocaine that CC-1 could ultimately purchase. Phone conversations and other communications occurred during which UC and CC-1 discussed a possible drug purchase by CC-1 from UC. CC-1 eventually desired to introduce UC to CC-1's "friend" and a meeting was arranged at a restaurant/casino location.

On June 2, 2024, DEA investigators surveilled and conducted a meeting during which UC (posing as a drug supplier) met with CC-1 and CC-1's friend, who was found to be Riley when Riley arrived at the meeting. The three met and had a conversation. Portions of the conversation between UC and CC-1 were in Spanish, and CC-1 translated the conversations for Riley. During the conversation Riley and CC-1 stated that they wanted to obtain "300" per month on a fixed schedule. Given the context, UC and investigators understood this to represent 300 kilograms of cocaine per month. During the conversation, Riley asked the UC, "how much per kilo," meaning kilogram, and suspected to mean a kilogram of cocaine. Riley and CC-1 ultimately agreed to $11,000 per kilogram when 50 or more kilograms were purchased. Riley and CC-1 also informed the UC that they had enough bulk currency to acquire "50" as soon as possible, suspected to mean 50 kilograms of cocaine. During this meeting, CC-1 stated that the last order he and Riley made

for 25 kilograms of cocaine was of poor quality and hurt their trafficking organization. At the end of the conversation the UC informed Riley and CC-1 that after getting approval for this order the UC would reach out to finalize a date to make the transfer of the discussed 50 kilograms.

On June 12, 2024 at approximately 12:00 p.m., the UC arranged with CC-1 for another meeting. At approximately 12:28 p.m., CC-1 was observed parking his BMW near the meeting location at a hotel. At approximately 1:00 p.m., Riley arrived at the same location in his Honda. The UC exited the hotel and met with both Riley and CC-1. The UC asked to see the money, and CC-1 translated the conversations for Riley and told Riley that UC wanted to see the money. Riley responded that he did not bring the money. Riley told CC-1 that Riley wanted to test the "product" and make sure it was "A-1" before he provided all of the money. The term "A-1" represented high quality.

The UC responded that he could not provide the cocaine without seeing the money. CC-1 again translated for the UC and told Riley that the UC would not release the cocaine without seeing the money; Riley stated that Riley wanted to buy one kilogram of cocaine to test the quality and if it was of "A-1" quality, he would buy all 50 kilograms. UC advised that he would accept the purchase of one kilogram as long as they agreed to purchase the 50 (if the one kilogram was deemed good in quality). Riley advised CC-1 to tell the UC that they would go get the money to purchase one kilogram of cocaine. Riley departed (investigators believed to get money).

Ultimately, DEA placed Riley and CC-1 under arrest before they returned to meet with the UC (due to safety concerns). Investigators observed Riley throw a black plastic bag into the rear passenger seat of CC-1's vehicle.

A search of CC-1's BMW was conducted. Approximately $11,981 in United States currency was recovered from the bag that Riley tossed into the back seat and from Riley's person, believed to be the money to pay for the purchase of the one kilogram of cocaine

A search of Riley's Honda revealed one .357 Glock semi-automatic handgun (serial number BWEY764) loaded with fourteen rounds of .357 caliber ammunition. The weapon was located in between the driver's seat and center console of Riley's Honda. An extended ammunition magazine containing 40 caliber ammunition was recovered from the Honda. Approximately $4,066 was recovered from the Honda.

DEA also executed federal search warrants at other locations:

From Riley's residence located in Towson, Maryland, investigators discovered a large sum of bulk U.S. Currency (approximately $302,205), a money counting machine, and a large amount of suspected marijuana.

From the Saratoga Apartment located at 222 E. Saratoga Street, Apt 904, Baltimore, Maryland investigators discovered:

11

- From a black tote inside the hallway closet, a large amount of an off-white powder, (the parties reserve the right to dispute the nature of this substance depending on available lab analyses);
- From inside a kitchen cabinet was a green bag that contained a knotted plastic bag containing approximately 53 grams of a fentanyl and heroin mixture;
- Plastic bags with a powder residue; sifters; metal utensils with powder residue; gelatin capsules; suspected cutting agents; digital scales; suspected drug packaging material; two respirators; a mechanical press; a mixer and mixing bowl with powder residue;
- A brown and silver single shot .22 caliber pistol bearing serial number 88638 (the weapon was examined and was found to be not operable); and
- Paperwork in the name of Co-Conspirator 1 with a listed address of 222 E. Saratoga Street, Apt 904.

The U.S. currency, firearms, and ammunition described above constituted proceeds of Riley's drug trafficking activity or were used, or intended to be used, to facilitate his drug trafficking offense.

Money Laundering Evidence

Riley engaged in money-laundering activities in furtherance of his narcotics trafficking activities. Riley would transfer money to the suppliers and accomplices outside of Maryland in order to pay for drugs. Riley conducted financial transactions, including the sending of wire transmissions of money, in order to promote the carrying on of the narcotics activities. The money used during those transactions constituted the proceeds of narcotics trafficking, and Riley knew that the money used during those transactions constituted the proceeds of narcotics trafficking. During the investigation, Riley would visit commercial establishments, such as grocery stores, and would send transmissions of money through Western Union from those locations to recipients. Riley would conceal his identify when he engaged in those transactions by using a name that was not his own. In furtherance of his narcotics activities, Riley sent transmissions of money to narcotics associate recipients on the following dates: on February 6, 2024, two Western Union transmission of $1000 each from a Giant grocery store in Baltimore, Maryland; on February 6, 2024, two Western Union transmissions of $1000 each from a Safeway store in Towson, Maryland; and on February 12, 2024, a Western Union transmission of $1000 from a Safeway store in Towson, Maryland.

Riley participated in the drug trafficking and money laundering activities in the District of Maryland.

SO STIPULATED:    _____
                  Michael C. Hanlon
                  Assistant United States Attorney

                  _____
                  Corey Omar Riley
                  Defendant

12

_____
C. Justin Brown, Esquire
Counsel for Defendant

13